UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MICHAEL JAMES RUSSUM,

    Petitioner,

v.

MR. T. BOWSER,

    Respondent.

Case No. 2:18-cv-02035-AA

OPINION AND ORDER

AIKEN, District Judge:

Petitioner brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his sodomy convictions on grounds that he was denied his constitutional rights to counsel under the Sixth Amendment. The Oregon courts rejected his claims, and petitioner fails to overcome the deference this Court must afford those decisions. Petitioner is not entitled to federal habeas relief, and the Petition is denied.

## BACKGROUND

In August 2009, petitioner was charged with four counts of Sodomy in the First Degree. Resp't Ex. 102. The charges arose from the abuse of petitioner's stepdaughter, KV, when she was seven and eight years old.

Page 1    - OPINION AND ORDER

Prior to trial, petitioner was detained at a Multnomah County jail. Detective Hickey, a police detective working on the case, suspected that petitioner was attempting to influence his wife, and Det. Hickey requested that jail officials monitor petitioner's outgoing mail. As part of that process, jail personnel opened and scanned petitioner's mail and provided it to Det. Hickey. After reading some of the letters, Det. Hickey realized that at least one letter was written to petitioner's criminal defense attorney. Det. Hickey notified the prosecutor and mailed the letter to defense counsel. Petitioner and his attorney subsequently discovered that additional attorney-client correspondence between them had been opened and resealed outside of petitioner's presence, including envelopes marked "Legal Mail." It was unclear whether those letters had been read by jail personnel or Det. Hickey. *See State v. Russum*, 265 Or. App. 103, 105-07, 333 P.3d 1191, *rev. denied*, 356 Or. 575, 342 P.3d 88 (2014).

Petitioner moved to dismiss the indictment, with prejudice, based on the intrusion into his confidential attorney-client communications. The trial court denied the motion, finding that the confidential communications were not exploited by Det. Hickey or provided to the prosecutor, and it was unclear how the communications would have any impact on petitioner's trial. 265 Or. App. at 109. Further, the trial court found no precedent for petitioner's requested remedy of dismissal with prejudice. Instead, the trial court issued a precautionary order and prohibited Det. Hickey from testifying about anything he learned from the letter. *Id.* The case proceeded to trial.

In his opening statement, petitioner's counsel argued that none of the professionals involved in the investigation displayed any "professional curiosity" to probe or question the details of KV's allegations. Resp't Ex. 103 at 212-14. Counsel also argued that once a child victim makes a disclosure, "it starts a cascade of events and there's no stopping it." Resp't Ex. 103 at 212.

During the State's case in chief, KV testified that petitioner had put his "front private" in her mouth on four different occasions. Resp't Ex. 103 at 222-23. KV's mother testified that KV had disclosed to her older sister that "when nobody else was around that, you know, Daddy would make her close her eyes and put something in her mouth." Resp't Ex. 103 at 242.

Noelle Gibson, a pediatric nurse practitioner, also testified. Ms. Gibson had conducted a forensic medical examination of KV at CARES Northwest, a nonprofit organization whose mission "is to provide…medical evaluations for children who are suspected to be victims of abuse or neglect." Resp't Ex. 103 at 276. Ms. Gibson described the physical examination and testified that KV whispered to her, "And this is, quote, My daddy put his private in my mouth, end quote." Resp't Ex. 103 at 283.

On cross-examination, petitioner's counsel questioned Ms. Gibson about the nature of her examination, as follows:

> Q: Okay. So what do you do to rule out false accusations?
>
> A: You know, we gain -- we gather as much history as we can, including previous history, talk with the people -- As much as possible, we talk to the people that initially were disclos -- the disclosure was initially made to or as close there as possible and talk with the child and do a physical examination.
>
> Q: Okay. But how do you rule out false accusations or inaccurate reporting?
>
> A: Just how I said. We base it on the history, the physical examination, and the child's statements and -- you know, again, it's one of those things you can never completely rule anything out, but there's a lot of medical diagnoses that cannot, you know, completely be ruled out or in.
>
> Q: Okay. Does that mean, then, that if I'm representing somebody who comes to my office and says, "I'm being accused of molesting my grandson," can I then have the grandson sent over to you to be evaluated to rule out the molestation?
>
> A: I don't think we rule out. I think we -- we make a diagnosis based on the information available as to likelihood that it occurred.

Page 3    - OPINION AND ORDER

> Q: Okay. So you don't rule anything out. You just document what people come in and tell you.
>
> A: And what we -- what we observe.
>
> Q: Okay. But in this case you didn't observe any physical signs of abuse.
>
> A: That's correct.
>
> Q: So all you're doing here now is just reporting, writing down and repeating what someone just told you.
>
> A: Right.
>
> ***
>
> Q: So it's just repeating the same story, correct?
>
> A: Correct.

Resp't Ex. 103 at 286-288. After counsel's cross-examination, the prosecutor conducted a short, redirect examination:

> Q: … Did you make treatment recommendations in this case?
>
> A: Yes, I did.
>
> Q: And that's something that you do at CARES, correct?
>
> A: Yes.

Resp't Ex. 103 at 297. Petitioner requested re-cross examination and elicited the following testimony from Ms. Gibson:

> Q: What were those treatment recommendations related to?
>
> A: Again, the history, physical examination.
>
> Q: You mean -- Well, what were your treatment recommendations?
>
> A: Would you like me to read them?
>
> Q: Please.

Resp't Ex. 103 at 297-98. Ms. Gibson proceeded to read twelve recommendations, including the recommendations that "[KV] should be entered into individual therapy with a therapist experienced in treating children who have been the victims of sexual abuse" and that KV's older sister and petitioner's other children were potentially at risk for abuse and should be examined. Resp't Ex. 103 at 298-300.

Kimberly Goldstein, a social worker for CARES Northwest, testified about her recorded interview with KV, and the interview was played for the jury. Resp't Ex. 103 at 305, 308-345. During the interview, Ms. Goldstein asked KV what she had whispered to Ms. Gibson during the medical examination. Rather than tell Ms. Goldstein, KV agreed to write what she had said. Ms. Goldstein testified that KV wrote, "My dad makes me suck on his private." Resp't Ex. 103 at 325.

During closing argument, petitioner's counsel attempted to discredit the testimony of Ms. Gibson and Ms. Goldstein by arguing, "Their job is to convince you that when a child makes these accusations, that it's true. They are set up for that purpose." Resp't Ex. 103 at 407. Counsel continued:

> I'm not in any way saying these people here from CARES wake up every morning and go, "Let's just make up some stuff and convince some people." They don't do that. They don't (inaudible). But when that's all you do and that's your focus, sometimes you lose objectivity.

***

> The CARES interview and the entire CARES process is a staged play. They come in and they begin with a CARES medical evaluation. You get a medical evaluation. How can you not trust a person wearing that -- the metaphorical white coat? Well, my question to Ms. Gibson was, "It's not really like a medical exam, is it?" "Well, actually, it's not." Because the medical exams, you don't have Community Partners. Anytime somebody starts to use one of the euphemisms like Community Partners or the cops, they're trying to sell you something….Yeah, they're there for a purpose. They're there knowing that this is where this is going to end up. That's why they do it.

> \*\*\*
>
> Why would they do the medical examination first, the part that cannot be reported, the part that you don't get to see, the part where the child says, "Something was put in my mouth," and before she knows it, there's somebody staring at her privates through a microscope? ... Again, it's not done maliciously, but that happens (inaudible). Ms. Gibson said, "Well, we always do that."… The (inaudible) commitment to the consistency of the process, that's more important than the result.
>
> \*\*\*
>
> In opening I said this concept was very much like a train. Once it gets started, it doesn't stop. Once you go to CARES, there's no critical analysis. There's no question. There's no testing for (inaudible) the information. There's packaging and presentation. The train not only has left, it's not slowing down[.]

Resp't Ex. 103 at 407-16. The jury convicted petitioner of all four sodomy counts.

At sentencing, petitioner's counsel presented argument and a statement by petitioner's grandfather on petitioner's behalf. Resp't Ex. 103 at 434-37, 439. Based on the circumstances of the case, petitioner's criminal history, and the lack of "actual mitigation in relation to the case or to Mr. Russum," the court felt "compelled to follow the State's sentencing recommendation." Resp't Ex. 103 at 444-45. Accordingly, the court imposed consecutive sentences of three hundred months on Counts 1 and 2, and concurrent sentences of three hundred months on Counts 3 and 4, for a total sentence of six hundred months. Resp't Ex. 101.

Petitioner directly appealed the denial of his motion to dismiss the indictment on grounds that the interception of his mail violated his Sixth Amendment right to counsel. Resp't Ex. 104. The Oregon Court of Appeals affirmed in a written opinion, and the Oregon Supreme Court denied review. *State v. Russum*, 265 Or. App. 103, 333 P.3d 1191, *rev. denied*, 356 Or. 575, 342 P.3d 88 (2014).

Petitioner then sought post-conviction relief (PCR) on grounds that his counsel provided ineffective assistance by eliciting Ms. Gibson's treatment recommendations and failing to

introduce mitigation evidence at sentencing. Resp't Ex. 115. The PCR court denied relief, and petitioner appealed regarding counsel's elicitation of treatment recommendations. Resp't Exs. 136-37. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. Resp't Exs. 139-41.

On November 21, 2018, petitioner sought federal habeas relief in this Court.

## DISCUSSION

Petitioner raises five grounds for relief in his Petition. However, petitioner presents no argument in support of Grounds Three and Four. *See* Pet'r Br. (ECF No. 30). Accordingly, petitioner fails to meet his burden of establishing entitlement to habeas relief on those grounds. *See Mayes v. Premo*, 766 F.3d 949, 957 (9th Cir. 2014) (a habeas petitioner bears the burden of proving his case); *Davis v. Woodford*, 384 F.3d 628, 637-38 (9th Cir. 2004) (accord).

Respondent maintains that petitioner's remaining claims are either unexhausted or were denied by state court decisions entitled to deference.

A. <u>Failure to Present Mitigating Evidence at Sentencing</u>

In Ground One, petitioner argues that counsel's failure to present any mitigating evidence at sentencing essentially left the trial judge with no basis to reject the State's sentencing recommendation of six hundred months. Respondent maintains that this claim is unexhausted and barred from federal review.

A state habeas petitioner must exhaust all available state court remedies – either on direct appeal or through collateral proceedings – before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). To meet the exhaustion requirement, the petitioner must "fairly present" a federal claim to the State's highest court "in order to give the State the opportunity to pass upon and to correct alleged

violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam) (quotation marks omitted); *Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir. 2011) ("Exhaustion requires the petitioner to 'fairly present' his claims to the highest court of the state.").

If a claim was not fairly presented to the state courts and no state remedies remain available for the petitioner to do so, the claim is barred from federal review through procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 732, 735 n.1 (1991); *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002) ("A procedural default may be *caused* by a failure to exhaust federal claims in state court."). A federal court may consider unexhausted and procedurally barred claims only if the petitioner demonstrates cause for the default and actual prejudice, or if the lack of federal review would result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman*, 501 U.S. at 750.

Petitioner asserted his lack of mitigation claim in his PCR petition, but he did not raise it on PCR appeal. Resp't Exs. 115 at 4-6, 137. Plaintiff can no longer present this claim to the Oregon appellate courts, and it is unexhausted and procedurally defaulted. *See* Or. Rev. Stat. § 138.650(1) (requiring PCR appeals to be filed within thirty days after judgment). Petitioner presents no evidence or argument to demonstrate cause and prejudice to excuse the procedural default, and federal review of this claim is barred by procedural default.

B. <u>Elicitation of Treatment Recommendations</u>

In Ground One, petitioner also contends that counsel's elicitation of Ms. Gibson's treatment recommendations introduced impermissible testimony that vouched for the credibility of KV and constituted ineffective assistance. The PCR court rejected this claim, and respondent maintains that its decision is entitled to deference.

A federal court may not grant habeas relief regarding any claim "adjudicated on the merits" in state court, unless the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" established federal law if it fails to apply the correct Supreme Court authority, or if it reaches a different result in a case with facts "materially indistinguishable" from relevant Supreme Court precedent. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct legal principle but applies it in an "objectively unreasonable" manner. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam); *Williams,* 529 U.S. at 407-08, 413.

Under the well-established precedent of *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner alleging the ineffective assistance of counsel must show that 1) "counsel's performance was deficient" and 2) counsel's "deficient performance prejudiced the defense." *Id.* at 687. To establish deficient performance, petitioner "must show that counsel's representations fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Unless petitioner "makes both showings, it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Petitioner's trial took place after the Oregon Supreme Court issued its opinion in *State v. Southard*, 347 Or. 127, 218 P.3d 104 (2009). There, the trial court had allowed the admission of a diagnosis of child sexual abuse, based solely on an interview with the child and without corroborating physical evidence. 347 Or. at 131-32. The Oregon Supreme Court found that the

probative value of such testimony was substantially outweighed by the danger of unfair prejudice, because the diagnosis "did not tell the jury anything that it was not equally capable of determining" and "created a substantial risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence.'" *Id.* at 140-41 (citation omitted). Since *Southard,* the Oregon Court of Appeals has repeatedly found plain error when the State is permitted to introduce a diagnosis of sexual abuse without physical findings to support the diagnosis. *See State v. Volynets-Vasylchenko*, 246 Or. App. 632, 638, 267 P.3d 206 (2011) (citing cases).

In light of *Southard*, the prosecutor in petitioner's case agreed that the State would not offer testimony regarding any diagnosis of sexual abuse made by Ms. Gibson, because no physical evidence corroborated her diagnosis. Resp't Ex. 103 at 142-43. Despite *Southard* and the prosecutor's concession, petitioner's counsel elicited Ms. Gibson's specific treatment recommendations for KV, including the recommendation that KV undergo counseling with a provider experienced in treating sexual abuse victims.[1]

During the PCR proceedings, petitioner's counsel explained that his trial strategy was to assert that CARES was essentially an agent of the State in advancing allegations of sexual abuse. Counsel maintained that his cross-examination of Ms. Gibson furthered this strategy.

> A central theme of my defense was that, once the victim made the allegation, there was no way to stop the inevitable prosecution, largely because the investigators, particularly the personnel at CARES Northwest, failed to question the victim in any meaningful way and merely recorded what she told them. A key to that theory of defense was to demonstrate that the medical examination conducted by CARES was not actually undertaken to diagnose and treat the child, but instead to prepare for prosecution.

---

[1] In *Volynets-Vasylchenko*, decided shortly after petitioner's trial, the Oregon Court of Appeals held that admission of a recommendation that the victim "be entered into individual age appropriate therapy, and that the therapist be skilled in working with children who have been victims of abuse" was plain error, because, like a diagnosis of sex abuse, it implied that the expert found the victim credible. *Volynets-Vasylchenko*, 246 Or. App. at 639.

Page 10 - OPINION AND ORDER

                                   ***

> Because I believed that the recommendations that she made demonstrated further that the purpose of the examination was not truly to diagnose and treat the child, I asked Ms. Gibson to read her recommendations. To the limited extent that those recommendations indicated that Ms. Gibson believed the victim, I concluded that the risk of prejudice was far outweighed by the benefits of offering that evidence to further my central argument in defense. I made a tactical decision to elicit that testimony, fully understanding the information contained within the treatment recommendations.
>
> As I expected to, I focused strongly in closing argument on the issue of the purpose of the medical examination, building on the testimony elicited from Ms. Gibson and others. For instance, I argued that CARES is set up for the purpose of convincing the jury that a child's accusations are true, that the entire CARES process is a "staged play," that the medical examination was not really a medical examination, and that CARES was not providing medical treatment but instead preparing for a criminal prosecution. I believed that Ms. Gibson's treatment recommendations supported those arguments.

Resp't Ex. 133 at 1-2.

The PCR court found no deficiency in counsel's performance. Specifically, it found:

> Normally, the admission of the treatment recommendations for an alleged victim of sexual abuse would not be admissible because it would reflect that the evaluators believed that the child had been sexually abused. In this case, however, it was the trial attorney's strategy to attack the CARES evaluation and suggest that the sole purpose of the CARES evaluation was to secure a conviction rather than provide treatment. Part of that effort was to have the CARES evaluator read the treatment recommendations, many of which had nothing to do with treatment for sexual abuse. The trial attorney made a conscious decision to elicit the treatment recommendations as part of his strategy which is explained at length in his affidavit. While it may have been a risky strategy, it was not an unreasonable strategy given the strength of the state's case. The fact that the trial resulted in convictions on all counts, does not prove that the strategy was unreasonable.

Resp't Ex. 136 at 2-3.

Petitioner maintains the PCR court unreasonably applied *Strickland*, because it failed to acknowledge that a decision by counsel – even if tactical – must still be reasonable, and counsel's cross-examination unreasonably elicited testimony that Oregon courts have repeatedly found inadmissible due to its prejudicial impact. *See Volynets-Vasylchenko*, 246 Or. App. at 638-39; *see*

Page 11    - OPINION AND ORDER

*also Edwards v. Lamarque*, 475 F.3d 1121, 1127 (9th Cir. 2007) (stating that, if counsel's decisions are found to be strategic, the issue then becomes whether the "tactics were reasonable"); *Jennings v. Woodford,* 290 F.3d 1006, 1014 (9th Cir. 2002) ("Although defense counsel is empowered to make such strategic decisions, *Strickland* demands that such decisions be reasonable and informed."). Although petitioner does not dispute the PCR court's finding that the State had a strong case against him, petitioner contends that counsel's elicitation of prejudicial testimony was not necessary to further his argument about CARES and cannot be considered sound trial strategy under the circumstances.

Although I question the wisdom of counsel's chosen strategy, the issue is not whether I would have found counsel's performance deficient. It is well established that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, the only question before this Court is whether the PCR court's rejection of petitioner's claim was an objectively unreasonable application of *Strickland*. *See Schriro v. Landrigan*, 550 U.S. 465, 473, (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Early v. Packer*, 537 U.S. 3, 11 (2002) (per curiam) (state court decisions may be set aside "only if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts'"). I can make this finding only if the PCR court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Pursuant to *Strickland*, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too…easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. In particular, courts must afford great deference to the strategic decisions of counsel. *Id.* at 690 (declaring that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). The PCR court afforded counsel the deference mandated by *Strickland*, and its ruling was not "so lacking in justification" so as to render it unreasonable.

As noted by the PCR court, Ms. Gibson's treatment recommendations, if elicited by the State, would have been inadmissible because such recommendations, like a diagnosis of sexual abuse, "pose[] the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible." *Southard*, 347 Or. at 141; Resp't Ex. 136 at 2. However, counsel's chosen strategy was premised on the notion that the CARES evaluators – including Ms. Gibson – accepted KV's allegations at face value, because CARES was designed to help secure prosecutions rather than provide diagnosis and treatment. In this context, the fact that Ms. Gibson's treatment recommendations may have implied her belief in KV's allegations arguably served to further counsel's argument that the CARES evaluation process was not unbiased or objective but instead grounded on the presumption that sexual abuse had occurred.

It remains debatable whether a reasonable defense attorney would have introduced Ms. Gibson's treatment recommendations in this case. The fact that this question is debatable, however, does not make the PCR court's decision unreasonable. On federal habeas review, a state court decision "must be granted a deference and latitude that are not in operation when the case involves

review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (explaining that a "doubly deferential" standard applies when "a federal court reviews a state court's *Strickland* determination"). In light of the deference owed to the PCR court, and despite my misgivings about the correctness of its decision, I do not find that it unreasonably applied *Strickland* when rejecting petitioner's claim.

### C. Interference with Confidential Attorney-Client Communications

Finally, in Grounds Two and Five, petitioner argues that his right to counsel under the Sixth Amendment was violated by the intrusion into his confidential attorney-client communications and that prejudice should be presumed.

Petitioner raised this claim on direct appeal and argued that the trial court should have granted his motion to dismiss the case with prejudice. Resp't Ex. 104. The Oregon Court of Appeals disagreed. It held that "no presumption of prejudice arises in the absence of evidence of a purposeful intrusion that conveys the content of attorney-client communications to the prosecution" and found that the record supported the findings "that the intrusions into [petitioner's] mail were not purposeful" and did not convey any protected communications to the prosecution. *Russum*, 265 Or. App. at 111, 119-20. The Court of Appeals also rejected petitioner's argument that his "chilled" communications with counsel constituted prejudice, noting that petitioner "had already fully expressed himself in the letter before the detective inadvertently saw it" and continued to communicate freely with his attorney. *Id.* at 120.

Petitioner fails to show that the Oregon Court of Appeals unreasonably applied clearly established federal law. As petitioner concedes, the Supreme Court has held that state intrusion into confidential attorney-client confidences does not violate the Sixth Amendment when there is "no tainted evidence…, no communication of defense strategy to the prosecution, and no

purposeful intrusion" into the attorney-client relationship. *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977). The Oregon courts made the factual finding that no evidence was tainted, the prosecutor was not apprised of the letter's contents, and Det. Hickey did not intentionally intrude into petitioner's relationship with counsel. This Court must accept those factual findings. 28 U.S.C. 2254(e)(1).

Accordingly, petitioner fails to show that he is entitled to federal habeas relief on this ground.

## CONCLUSION

The Petition for Writ of Habeas Corpus (ECF No. 1) is DENIED. A Certificate of Appealability is issued on Ground One alleging that counsel rendered ineffective assistance by eliciting Ms. Gibson's treatment recommendations for KV.

DATED this  31st  day of August, 2020.

        /s/Ann Aiken
Ann Aiken
United States District Judge